Good morning, Your Honors. May it please the Court, my name is David Tarlow for RMG Technologies, the appellant in this case. This is an appeal of a grant of a preliminary injunction, order for preliminary injunction. And the order granted a preliminary injunction on three grounds, as you'll know from the briefs. The first ground was copyright infringement, the second ground was violation of the Digital Millennium Copyright Act, and the third ground was breach of contract. It's our position that the preliminary injunction should not have been granted on any three of these grounds because there is not the substantial probability of succeeding on these grounds at time of trial and because Tickemaster did not show any irreparable harm in trial court below. I'd like to just first start off with the copyright infringement. The Copyright Act, as you know, was basically intended to protect original works and to foster creativity in the arts and music and literature, etc. Tickemaster maintains a website and that website is copyrighted. Tickemaster has used the fact that it has copyrighted its website in this matter to basically use the Copyright Act as a sword against anyone who dare violate the terms of use of its website. And those terms of use of its website have many provisions, such as the prohibition of commercial use of the website, exceeding posted ticket limits, the use of automated devices, which is never defined anywhere in the terms of use of the website, etc. In this matter, Tickemaster claims that the copyright infringement comes from the process of what's called automatic caching. Whenever you go onto a website on the Internet, the page is automatically cached into the RAM of the computer for, could be milliseconds, could be longer depending on how the computer is set. But it is not an intended function of the user, for the most part, that the pages that are looked at are being copied. Basically, the pages that are looked at are being viewed. This is simply an incidental function of going onto the Internet, which causes a reproduction of the page. Tickemaster claims that this incidental caching of the pages constitutes copying onto the copyright of the Internet, and because it may be in excess of the terms of use, that this is a copyright infringement. Are you contending that this is not copying, or are you contending that it's fair use? I'm intending that it's fair use. First of all, Your Honor, I'm intending that this type of copying is not the type of copying that the Copyright Act was actually intended to prevent. But are you conceding that it is copying? Well, I'm conceding that there is a reproduction, yes, a copy that's stored in the random access memory for at least some period of time after a web page is viewed. Right. Okay? And this is not simply what the Copyright Act was intended to prevent, because there's no exploitation. In fact, if you look at the record in this case, it seems as though all of the testimony shows that the reason for the software program's issue here are so that you don't even have to look at the website, that the whole purpose is to go and actually buy tickets, not to look at copyrights, not to copy copyrighted content, not to use copyrighted content, simply to buy tickets for events. So in the trial court, it was found that this was a copyright infringement. We believe that this actually constituted fair use of the Ticketmaster website. And doing a fair use of it. Even though it's very clear that what you're doing, whether a breach of contract or not, is precisely what Ticketmaster does not want you to do. As far as? As far as buying large numbers of tickets exceedingly rapidly. I mean, that's the purpose of what's going on here, correct? Well, the purpose of the software is to enable the purchaser to buy tickets. I don't think that there's any testimony anywhere in the record that any ticket limits have ever been exceeded. In fact, I think that the record's pretty clear that posted ticket limits are posted by Ticketmaster to allow you to only purchase a certain amount of tickets per single transaction. And I don't think there's any evidence that more than any posted limits were ever purchased in a single transaction. But I think this is right. There's no mystery to your client that what you're doing is something that Ticketmaster doesn't want you to do. Well, Ticketmaster claims that they don't want automated devices using their website. I think that there is a conflict. It's a little broader than that. What they don't want is someone purchasing large numbers of tickets very rapidly so that ordinary folks, human beings who'd like to purchase a ticket are not shut out of the market within a very short time after the tickets go on sale. I mean, that's obvious. I mean, that's the commercial reality, correct? That's the commercial reality, yes, Your Honor. In this case, I believe that the software at issue does constitute fair use with respect to the copyrights of Ticketmaster's website. Because what I want to do is try to parse it down as to the actual copyrights that we're talking about. The copyrights are the copyrights on the website itself. None of those copyrights are being exploited. There's been no testimony. There's been no declarations that anyone's using those copyrights to actually copy the terms of use and put it on a competing website, that they're using information to put that information on a competing website and to use it to either compete with Ticketmaster in any manner. The copyrights that we're looking at are simply used by the automatic caching. If you look at the purpose and character of the use that the software that the client produces is alleged to put it through, there is no use. There's no use of the copyrights at all from the Ticketmaster website. They're not being used for anything. There's no allegation that they're being used for anything. Let me ask you this. Would your client be able to do what it's doing without the caching function? Well, I don't think there's any testimony of that in the record, but I think that caching is something that is controllable by the user. I think that most computers are set to automatically cache for the simple purpose of making the use of the Internet more enjoyable for the end user. So you don't have to completely refresh each time you hit the button. So while I confess to a certain amount of ignorance about computers, it does seem to me that the caching function allows your client to perform the function it wishes to perform much more rapidly. Is that correct? Well, I wouldn't go that far, Your Honor, because to be honest, I don't know. And to be honest, there is no testimony in the record from any witness as to whether that automatic caching function permits the software at issue to work faster, to do anything at a different speed than it would have. I think, you know, from my understanding as to what caching is, caching allows you to go back and have the screen pop up. But I'm not a computer expert. Now, subject to being corrected by some computer expert, and maybe there's one in the room, maybe there's not. Lawyers are good at some things and not good at others. But my understanding of caching is that it brings things onto the user's hard drive so that they don't have to go through the time-consuming problem of every time they want access to it, they've got to go back to the original source. Of reloading the same page? Yeah, yeah. So it makes it faster. I'm not sure whether or not it makes my clients' software faster. I'm just not. I'm not sure whether it makes your client's software faster, but it makes the ticket purchasing faster. I'm not sure of that either because there simply is no evidence of the record of it. Okay. But in a way, I guess my questions are off to one side when I ask them in the form of, doesn't this make it easier for your client to perform the function it wishes to perform, which is to say rapid purchase of tickets, when the question might be not whether it makes it easier to do it, but rather whether your client is, in fact, using that cached page. And I think the answer to that is obvious, they are. Well, the answer, all I can say is it may. I don't know personally, but it may be. Mr. Tarlow, I have a question for you, please. Sure you are. Assuming we take fair use out of the equation, if it's not fair use, is there some other element of copyright violation that is not invoked, you know, when the website is viewed and there's a copy in the cache? In other words, I'm sympathetic. I think it's not like a traditional misappropriation of the copyright to go sell a duplicate website. But technically, is there an element of copyright violation that's not reached if we reject fair use? Well, Your Honor, as far as an element, as an element, I think you're talking 17 U.S.C. 106. I'm not so sure. But looking at the case law, and specifically the 20th Century case, which I cited in this matter, when you have a new type of technology that sometimes does not fit into the traditional boundaries of copyright law, sometimes you need to look past that. Sometimes you need to look at what the effect of the new technology would be and what the effect on applying copyright law to it would be. In this case, if you apply copyright law to the function of automatic caching on a public website that anyone could go on to, rather than just applying traditional breach of contract, what you're going to have is you're going to have thousands of people throughout the country trying to enforce the terms of use on their website, not on breach of contract, but on copyright infringement. It's going to flood the courts with litigation based upon the fact that you can get statutory fees and you can get attorney's fees. I don't think that this is the traditional case that we're talking about, a copyright infringement. It's not like this is a type of case where someone's copying a book, they're putting it on Xerox machine and going out and selling a cacher and a rye. This is a case where someone's simply going on to someone's website. In fact, I don't even think that Ticketmaster knew that they even had a copyright claim here when they initially brought this lawsuit, because it wasn't until they were faced with a 12v6 motion that they amended and added to those causes of action for copyright infringement in Digital Millennium Copyright Act. It simply does not. Can you address likelihood of success on the contract claim? I can see some difficult issues on copyright and DMCA, but why isn't it just a straight violation of the terms of use and the contract? I think what we need to do with that question, Your Honor, is look to what the court below found, the factual findings. The factual finding was that sometime in the past, my client would have had to have violated the terms of use in order to make the software in the first place. Ticketmasters, they said in their papers that it was back in 2003 that they put those terms of use in, so I'm not so sure that that was a correct finding. But when we're talking about a preliminary injunction, preliminary injunction is not supposed to punish past conduct but to deter future conduct, and there was no finding of fact that anything that my client did to violate the terms of use of this website was ongoing. She just did not find that. Well, certainly the program seems to be enabling ticket brokers to violate the terms of use. I don't necessarily think that that's true, and this is a piece of software that's used not only on Ticketmasters' website, but it can be used on four or five different other websites, eVenue.net, Tickets.com, the FIFA soccer websites. It's not simply used on Ticketmasters' website, and there are controls to how it can be used. Ticket brokers themselves can control this piece of software so that it doesn't violate anything. They can slow down the speed at which it purchases tickets. They can slow down the speed at which it searches for tickets, and I know that that's not anywhere within the record, but that's the reality. I think Chris Kovacs did talk about the fact that he could set the parameters of this software to address certain types of ticket purchasing realities. So it's useful software, not just on Ticketmaster, and it can be customized as to how it goes on to a certain website and how it behaves. Can I ask you in terms of the past and future, your client made this device. Would they go on making the device if they were not enjoined? Would they go on making the device if they were not enjoined from doing so? Yeah. Well, I think that my client's obviously appealing the case. Obviously, they want to continue within the business and servicing ticket brokers. So it's not just they're not being punished for the bad behavior, but prevented from engaging in the future, if that's the way it's understood. Well, at this point, the preliminary injunction stops them from selling or facilitating the use of the software. So at this point, they're not allowed to basically market the software like they were before. No, but the future is aimed at, not the past. Well, as far as the breach of the terms of use, I don't think it violates the terms of use of selling a piece of software. Okay? The violation of the terms of use, the court found, came from the fact that they had gone on the website in the past in violation of the terms of use. So I'm just, I'm sticking with what the findings of the court below were. The findings of the court below were simply that, in the past, we know you had to go on there because you created the software in the first place. Okay. Well, the software can be used by a ticket broker who's not as, you know, scrupulous as a lawyer in the courtroom to violate the terms of use if they want to do so, right? Correct. But a gun can also be used to kill someone. The fact that you put something in the hands of someone doesn't necessarily mean that they're going to abuse what they have. Yeah. Well, I'm not sure that analogy is all that helpful to you because it seems to me the primary and perhaps the only purpose of this device is to be used in precisely the way that it's being used in this case, whereas, you know, guns have lots of uses, most of them entirely permissible. Well, I think that this software can be used in permissible ways. I think it is being used in permissible ways. There's testimony from Mr. Garibay that it's used on other sites. Since the preliminary injunction in this matter, I haven't really heard anything from Ticketmaster as far as violations, other than the fact that they looked for some expedited discovery about a month afterwards. Another element in order to get to a copyright violation would be irreparable harm. I don't think that there has been a showing of irreparable harm here at all, and I think that irreparable harm is something that needs to be shown. The court below found that it was presumed, but I think that the eBay case states that that no longer is the case, that you actually have to show irreparable harm. Ticketmaster has its clients, which are venues, sports teams, promoters, artists, et cetera. There's been no testimony from anyone that any of their clients are upset with this. I mean, bottom line is ticket brokers, they take the risk of loss of tickets that they buy. Okay? Ticket brokers could create a sellout of a show that would never have sold out. So they're taking the risk of loss. I don't necessarily think that there's been a showing of irreparable harm, because none of the clients that Ticketmaster says they have, thousands of clients, have come forth with any evidence saying that they are not happy with the fact that tickets sell out. Ticketmaster has presented evidence with respect to Hannah Montana, but I don't think that any of that evidence is focused on the use of automated programs, the use of software. I mean, basically you have a show where there are millions of fans, and there are below hundreds of thousands of tickets available. Ticketmaster has presented in their own papers responses to customers who have said, hey, I'm really upset. I went on the website to buy tickets, and within a minute after they went on sale, all the tickets were gone. And Ticketmaster says, hey, when there's only a few thousand tickets available to a concert, it's going to sell out anyway within a couple of seconds. So there's really no way to correlate other than the fact that Ticketmaster says, hey, we saw a couple of tickets on sale on Mr. Pryor's website, his Hannah Montana show, but Ticketmaster, who's got the records, they're the ones who maintain the website, comes forth with no evidence that Mr. Pryor bought those tickets from Ticketmaster.com. They could have been purchased from other sources, such as other brokers. They could have been purchased directly from promoters, or, you know, there could have been other places. But I just think that there's been a lack of evidentiary showing that there really has been any irreparable harm. Ticketmaster comes forth with another couple pieces of evidence to present at the lower court. I think we've got the point. You're down to about a minute. Let's hear from the other side, and then we'll make sure you have a chance to respond. Okay. You know what? At this point, I'll save the rest for rebuttal. Yeah, that's what I'm suggesting that you do. Good morning, Your Honors. May it please the Court. My name is Mark Lee, and I represent Ticketmaster in this appeal. I would like to address first the points that counsel made, and then try to answer some of the questions that the Court had, as well as any others the Court may have in this appeal, in this argument. Counsel's first statement was there was no copyright infringement because there was fair use. I don't believe there was fair use for several reasons. First, defendants below had the burden of proving fair use, and they introduced no evidence to support the claim. Second, the evidence that was in the record clearly weighs against fair use. The use here was not transformative. They created a program that they wanted to permit their clients to use to copy Ticketmaster's website hundreds of thousands of times so that those clients could buy thousands of tickets that the public would not be able to buy. That's not a transformative use. Counsel? Yes. Let me say, I'm going to assume it's not fair use, but walk me through why it's a copyright violation to make a copy in the catch. Does that mean that if I go to Ticketmaster, I'm violating the Copyright Act also when I look at their website? Yes, sir. There were two questions there. The answer to the first question, are you making a copy, is yes. The second question was, are you infringing Ticketmaster's copyright? The answer is no. Why is that? That's because Ticketmaster's terms of use expressly permit anyone to come in, visit the website, and buy tickets for their own purposes. The truth is, to be realistic, everyone who posts a website that is viewable on the Internet intends people to come and look at that website. Doing that is obviously not copyright infringement, either because they have terms of use, as Ticketmaster did, that expressly permit it or because there's an implied license to do so. No one who doesn't want their website to be viewed would make it publicly viewable. However, when someone exceeds the scope of an express license, then they are engaging in copyright infringement. Ticketmaster's terms of use expressly prohibited the use of automated devices such as were used here to permit ticket brokers to come in, cut in line of ordinary people, and buy up all the best tickets. That is a copyright infringement, and I agree with Your Honor. Well, Your Honor didn't assert that, but I agree with the assumption it was not a fair use. And on that line of analysis, your copyright claim interlocks with your breach of contract claim. Yes, sir. If there's no breach of contract on your theory, then there's no copyright claim either. That is correct. And I would note, I understand it seems counterintuitive, frankly, to most of us who are not tech savvy, to think that simply going on a website and looking at a webpage makes a copy of it and might be copyright infringement if it weren't authorized. But I actually think the answer to that question was made years ago in a couple of Ninth Circuit cases, which we had cited in our papers, the MAI v. Peake case and the Triad case. Those cases were different, but the fundamental principles are the same. What happened there was someone manufactured a computer and also created the software for the computer. They sold the computer and licensed the software. Well, the owner of the computer wanted to have a third party come in and service the software, service the computer, excuse me. To do that, they had to turn the computer on, and that caused a copy of the software that was already in the hard drive to appear in the computer's random access memory so that the independent servicer could service it. The Ninth Circuit held in the MAI v. Peake case that that was copyright infringement. A year later in the Triad case, the same fact, someone argued, well, maybe a copy was made, but it was fair use. And the Triad court held, no, it's not fair use. Why? Because these people were coming in in excess of the terms of a license. They were making a copy that the license did not authorize them to make. There was no transformative purpose. They copied the entire thing, and their copying affected the value of the copyrighted work, therefore not fair use. Our facts are, if anything, it seems to me, more clear. Here we don't have what I would call a relatively innocent serviceman coming in to work on a computer. We have someone who created a computer software program that's specifically intended to breach our terms of use so that someone can make hundreds of thousands of copies of pages to buy thousands of tickets that they otherwise would not be able to buy to the detriment of the public. Well, is the Copyright Act violated just by the copying? You know, if there's not a license and not fair use, does the copying in your program or in your computer, does the copying violate the Act? As I'm sure your Honor knows, copyright infringement requires ownership of a copyright and violation of one of the exclusive rights in Section 106. Reproduction is one of those. And authorized reproduction does not violate the Copyright Act. And as I said before, it seems obvious to me that there's at least an implied license for virtually any consumer who comes on and views a website. However, when you have someone who for commercial purposes creates a computer program so that others for commercial purposes can come in and massively copy the website to give themselves an unfair advantage to buy tickets, I believe that is a copyright infringement. If I could just address some other points that counsel made. Counsel argued there was no evidence of a continuing breach. Actually, I think there was significant evidence in the record to that effect. The Ticketmaster website was massively assaulted, frankly, in July and August of 2007. You may recall in one instance Ticketmaster tried to use a technical fix to block the website and it worked for a day. Ticketmaster was able to block 6 million automated ticket requests that accounted for 80% of all of the traffic on its website on that day, but it didn't permanently stop the problem. After we filed a motion, Ticketmaster faced what I think could fairly be said as the worst public relations nightmare in its history. It was faced with massive criticism by the press. There were public hearings. Two state attorneys generals opened investigations based on the mistaken belief that Ticketmaster was somehow colluding with ticket brokers to prevent the public from getting tickets. And that harm continued right up to the time of the grant of the preliminary injunction. And, in fact, as is reflected in the excerpts of record that appellants submitted, there was some evidence that it even continued afterwards for some period. So there was certainly continuing harm. Was there irreparable harm? Well, yes. There was terrible harm with regard to Ticketmaster's goodwill with the public. But Ticketmaster was excoriated by hundreds, if not thousands of people, as is reflected in the record. I think the question may be, is it because Ticketmaster enjoys, essentially, the position of a monopolist as some of these shows? Everybody's got to deal with it to get the tickets. And no monopolist is very popular. Well, respectfully, without agreeing with Your Honor that Ticketmaster is a monopolist, let me say that harm to Ticketmaster's goodwill can be significant. Well, what happens? You say they have to buy from Ticketmaster or they can't buy. Well, that's not exactly true. They may give up on Ticketmaster and decide they can't buy tickets at the face price from the Ticketmaster website. Well, some people, what will they do? They'll buy the ticket brokers. At a much higher price. At a much higher price. They'll be very angry. Well, of course. They'll be angry at who? At the brokers? Well, maybe, but also at Ticketmaster. Yes, they have. Now, Ticketmaster is in business to provide a fair and equitable ticket distribution system. That's what Ticketmaster's clients want, and that's the service that Ticketmaster tries to provide to the public. If Ticketmaster is perceived as failing in that effort, then Ticketmaster's clients are going to be adversely impacted. And I would also note there is some... Well, you know, intuitively, there's something to your argument. Why didn't you have any clients testify that they wouldn't use Ticketmaster? Given the time constraints that were involved, we couldn't wait. But I will note this, Your Honor. There was some evidence in the record that clients were adversely impacted. For example, there's evidence in the record that there was a televised hearing  Ticketmaster had to appear and, in effect, defend itself for the public's inability to get tickets. But guess what? Ticketmaster was not the only one who had to be there. The venue had to be there, and Disney, which was sponsoring the Hannah Montana event that caused the hearing to take place, also had to be there. And Disney was, in fact, criticized in the press for using Ticketmaster as its ticket distribution system, with people saying things to the effect... This is not a quote, but things like, Well, you know, why use Ticketmaster if they can't solve the problem? Do something else. Use a better system. Harm to the public is real. The potential harm to Ticketmaster's goodwill with clients was also very real. Well, even if you didn't have the system, aren't a lot of people going to be mad at Ticketmaster for selling to ticket brokers and exhausting the supply of tickets pretty quickly anyway? Of course, Your Honor. There's always going to be frustration there, and I would acknowledge this is a basic supply-demand problem in many circumstances. But our point is that the software RMG created and distributed to its ticket broker clients made the problem worse. Well, that's true. And thus adversely impacted our goodwill. Ticketmaster is doing everything it can to create a fair system. And it won't be perfect. There will always be people who are frustrated because they can't get the ticket they want at the face price. But there will be more people who can't get the tickets they want at the face price if RMG software were permitted to continue to operate. I'm not sure how strictly relevant it is to the legal issues immediately in front of us. But it occurs to me to ask why Ticketmaster and others in Ticketmaster's situation don't prohibit us, in terms of part of the contract of selling the ticket, prohibit sales to brokers. I mean, you could ask someone before they purchase to say, I am not a broker. And to say, if you are a broker, you are buying a ticket in violation of the contract that you're now entering into. Why don't you do that? That's a very interesting question, Your Honor. And I'd have to think about that a little bit. There may be certain legal inhibitions with regard to the ability of someone who buys a ticket to resell it. They acquire it. And I can tell you, Your Honor, well, this is not a copyright issue, but there's something called the for sale doctrine. When someone buys something in America, they basically are allowed to resell it in many circumstances. We don't license the actual tickets. Those tickets are sold to people. And they can do whatever they want with them. And the truth is, ultimately, this case is not about ticket reselling per se. It's about a question of fairness in buying tickets from the Ticketmaster website. Well, if you're worried about that resale doctrine, as I understand, perhaps you could say no single entity can purchase more than 100 tickets. Well, I think that's an excellent suggestion, Your Honor. Well, take it back to your, you know... I assure you, we will do that. The reason I'm a judge and not a businessman is... Does the record now tell us before RMG Technologies enters with its program what percent of tickets are bought by brokers? It does not, Your Honor, because Ticketmaster does not know that. We... Ticketmaster only... They began to realize there was a problem with apparent automated ticket purchases early in 2007, but it was a growth process. However, I'm certain there's nothing on this in the record. And to the best of my knowledge, there is no way for Ticketmaster, realistically, to tell who is a broker and who is not when they buy a ticket. There is evidence in the record that people will use different names, they'll use different IP addresses, they'll use different credit cards, and that process makes it virtually impossible for Ticketmaster to make that determination. But I think the record is clear, however, that the use of automated devices has made what was already often a difficult situation much worse. The popular name for the brokers is scalpers. Yes, sir. One has a popular impression there's some kind of law preventing what they do. Is there no law preventing ticket scalping in these areas? There are a variety of laws in different states. They vary significantly. But the truth is, in many states, brokers can operate without violating the law. And also, because the Internet is so pervasive now, let's say, hypothetically, there were a law in New York that prohibited a certain type of broker to make a certain type of sale, the broker can simply be located in Texas and sell it over the Internet and create very difficult jurisdictional issues with regard to that law. So that's the best answer I can give, Your Honor. If I could just speak about a couple of other things. The counsel said that we can no longer presume irreparable harm under the eBay case. Respectfully, I think that's wrong. eBay was a permanent injunction case. This is a preliminary injunction case. The eBay...   First of all, it's a permanent injunction case. For a couple of reasons, Your Honor. A preliminary injunction is essentially intended to maintain the status quo until a case can be resolved on the merits. After the case is resolved on the merits, then a party, properly, should have to prove that there is no adequate legal remedy before they obtain a permanent injunction. That's what the eBay case says. In the preliminary injunction setting, however, the court has to make a quick determination based on a limited record to maintain the status... whether or not to maintain the status quo by entering a preliminary injunction. And as a result, I think it's reasonable to say that the presumption of irreparable harm should follow. In fact, we cited a couple of cases that did that, including the Federal Circuit, which had the very eBay case that got reversed. eBay was reversed. It went back to the Federal Circuit. And so that was a permanent injunction case that went through the four factors, as the Supreme Court said it should. But when it was faced with a preliminary injunction case shortly thereafter, it expressly maintained the presumption of irreparable harm because of the... Sometimes courts are very stubborn. I don't know if I should comment on that or not, Your Honor. In any event, in this case, we did have significant evidence of irreparable harm that I think more than adequately supported the entry of a preliminary injunction. That's all I have, unless Your Honor's have any further questions. How about your DMCA theory? Yes, sir. I was concerned that the CAPTCHA, if you call it that, is a technological measure that's being shut down or circumvented, but it's not aimed at preserving protected works so much as preserving the purpose of the website or integrity of it. If I understand Your Honor's question correctly, is it a technological measure? Yes, it is. The technological measure is that it essentially creates an encrypted password that computers are not supposed to be able to read. And they designed a measure to circumvent that. Now, is it protecting works? Well, yes. The ticket purchase pages are protected copyrighted works. In fact, Ticketmaster has its own separate copyright registration for the ticket purchase pages. So by preventing, blocking automated access to those pages, it is intended to prevent automated copying of those ticket pages because that violates the terms of use and thus constitutes copyright infringement. Okay. Your Honor, if you have no further questions, that's all I have. Okay. Appears not. Thank you very much. Thank you, Your Honor. Response? So much to respond to, so little time, so I'm just going to go through it. As far as the eBay case, it's been applied to preliminary injunctions. I've cited that in my brief. As far as Ticketmaster being able to take self-help measures, and as far as Ticketmaster being able to use a blacklisted IP address to stop people from buying, they can do it. They haven't done it themselves. As far as why don't they stop brokers from buying tickets and prohibit tickets from being bought for brokers, because Ticketmaster is a broker. Ticketmaster has purchased TicketsNow.com and it's become the second biggest broker in the country. They allow people to resell their tickets on the Ticketmaster website. If reselling wasn't legal, Ticketmaster would have to shut down those two parts of their business. As far as the DMCA, Justice Gould, absolutely, the DMCA violation that they're claiming, this CAPTCHA, the CAPTCHA is only meant to tell the difference between computer user and a human user. It's not intended to stop anyone from accessing any copyrights. If you look at the acronym itself, it's a Computer Automated Turing Device intended to tell the difference between humans and computers. Other than that, unless you have a question for me, I'm done. I think we do not. Thank both sides for a very useful argument today. Thank you. The case of Ticketmaster versus RMG Technologies is now submitted for decision and we are in adjournment for the day. Thank you very much.
judges: Noonan, Fletcher, Gould